IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
KNOXVILLE DIVISION

| | |
|---|---|
| IVA L. DAVIS, | ) |
|       Plaintiff, | ) |
| v. | )   No. 3:06-CV-223 |
| JO ANNE B. BARNHART,<br>Commissioner of Social Security, | ) |
|       Defendant. | ) |

**MEMORANDUM OPINION**

      This is an action for judicial review, pursuant to 42 U.S.C. § 405(g), of defendant Commissioner's final decision denying plaintiff's claims for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act. For the reasons set forth herein, defendant's motion for summary judgment [doc. 14] will be granted, and plaintiff's motion for summary judgment [doc. 12] will be denied. The final decision of the Commissioner will be affirmed.

I.

*Procedural History*

      A previous SSI application was denied in February 2004 on appeal to this court (No. 3:03-CV-012). Plaintiff filed her present application in April 2002, claiming to be disabled by back pain, carpal tunnel syndrome, diabetes, "nerves," and a ruptured hernia. [Tr. 96-97]. That claim was denied initially and on reconsideration. Plaintiff then requested

a hearing, which took place before an Administrative Law Judge ("ALJ") on April 14, 2004.

On November 18, 2004, the ALJ issued a decision denying benefits. He concluded that plaintiff suffers from "degenerative disc disease, arthritis, diabetes mellitus, depressive disorder and personality disorder," which are "severe" impairments but not equal, individually or in concert, to any impairment listed by the Commissioner. [Tr. 21]. The ALJ found plaintiff to have a limited residual functional capacity ("RFC") at the medium level of exertion restricted to "simple, unskilled repetitive work." [Tr. 25]. Relying on vocational expert testimony, the ALJ determined that plaintiff remains able to perform a significant number of jobs existing in the regional and national economies. [Tr. 24]. Plaintiff was therefore found ineligible for SSI benefits.

Plaintiff then sought review from the Commissioner's Appeals Council. On May 5, 2006, review was denied, notwithstanding plaintiff's submission of more than twenty pages of additional medical records. [Tr. 8, 11].[1] The ALJ's ruling therefore became the Commissioner's final decision. Through her timely complaint, plaintiff has properly brought

---

[1] Plaintiff's additional documents are discussed at great length in her brief and are included in the administrative record. [Tr. 317-37]. A case can be remanded for further administrative proceedings where a claimant shows that late-submitted evidence meets each prong of the "new, material, and good cause" standard of sentence six, 42 U.S.C. § 405(g). <u>Plaintiff's veteran Social Security counsel, however, has made no effort to articulate how the present evidence warrants sentence six remand, nor is sentence six even referenced in her briefing to this court</u>. The issue is accordingly waived, and plaintiff's additional evidence [Tr. 317-37] has *not* been considered. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993) ("Plaintiff has not only failed to make a showing of good cause, but also has failed to even cite this relevant section or argue a remand is appropriate."); *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (citation omitted).

2

her case before this court for review. *See* 42 U.S.C. § 405(g).

II.

*Background and Testimony*

Plaintiff was born in 1959 and has a tenth grade education. [Tr. 42]. She has offered conflicting statements regarding placement in special education classes. [Tr. 42, 44 (was "in special education the entire time"), 285 ("got special education for most classes"), 103, 134 (attended no special education)]. She purportedly struggles with reading, writing, and mathematics. [Tr. 42-43]. Plaintiff's only reported employment was more than twenty years ago, working as a coat inspector either for "about a month" [Tr. 46] or for two years [Tr. 286]. She can admittedly drive, shop, visit her mother, perform some housework, and care for four dogs, a parakeet, and an indoor chicken. [Tr. 44-45, 58-59, 122, 133, 191]. She can go with her boyfriend to flea markets [Tr. 60], and sometimes accompanies him when he is towing vehicles for pay. [Tr. 60-61].

Plaintiff testified that she is "bothered" by people and by noise. [Tr. 45]. She alleges difficulties with concentration, irritability, motivation, hallucinations, suicidal ideation, and fatigue. [Tr. 48-49, 152]. Plaintiff claims right hand pain "like a toothache" secondary to carpal tunnel syndrome. [Tr. 46-47]. According to her testimony, plaintiff also suffers from lower back pain, frequent urination, "restless legs," and an abdominal hernia. [Tr. 53-54].

Regarding her diabetes, plaintiff testified that she does not follow a regular diet as instructed by her treating physician. She is "not a good breakfast eater." [Tr. 55]. She eats "[m]aybe a snack for lunch." [Tr. 55]. For example, the day before her administrative hearing, plaintiff's lunch consisted of "an orange." [Tr. 57]. She also does not eat a regular meal at supper. [Tr. 56]. Plaintiff further testified that she refuses to use an insulin pump as recommended by her treating physician because "I went on it once and it made me sick. . . . knowing that it was the shooting [sic] that insulin in my stomach. . . . I said I don't want it. So it's sitting at my trailer." [Tr. 49-50].

III.

*Relevant Medical Evidence and Opinions*

A. Physical

Dr. William Culbert is plaintiff's treating physician. Dr. Culbert's notes reflect a very brief period of treatment in 2001 for "tennis elbow," but not for carpal tunnel syndrome. [Tr. 237].

In 2001, Dr. Culbert alternately described plaintiff's diabetes as "under good control" and as "uncontrolled . . . becoming insulin dependent." [Tr. 237-38]. In January 2002, Dr. Culbert "had an extensive conversation" with plaintiff regarding the interplay between her medication and her meals. [Tr. 236]. In March 2002, Dr. Culbert wrote that plaintiff's diabetes "has been under less than optimal control." [Tr. 235]. Plaintiff acknowledged that her inconsistent blood sugar levels were largely due to her undisciplined

4

eating habits. [Tr. 235]. The following month, Dr. Culbert suggested that plaintiff might "require" an insulin pump to gain control of her "very erratic" condition. [Tr. 235].

In May and June 2002, Dr. Culbert told plaintiff that she was a very strong candidate for an insulin pump. [Tr. 232-33]. She received a pump on July 24, 2002. After a mere week, she informed Dr. Culbert that it caused a headache and she did "not like" it. [Tr. 232]. Plaintiff accordingly "refuse[d] to use it." [Tr. 231]. Dr. Culbert wrote that

> [s]he says that she cannot stand to have it on her body and does not like to have a catheter in place. *She is not having any particular pain or problem*, but seems to be recalcitrant to negotiation on this point. Her sugar has been reportedly better controlled, but she is getting headaches. Current blood sugar is 121. *She says she thinks she can keep this controlled with a better diet.*

[Tr. 231] (emphasis added). Dr. Culbert's January 2003 notes continue to reflect his desire "to try and get this patient on a pump. She has resisted this heavily. . . . She is on insulin now and takes it appropriately, *but she still has very erratic eating patterns which makes this difficult to control.*" [Tr. 281] (emphasis added). Lastly, Dr. Culbert's May 28, 2003 notes reveal that he "spent an extended length of time on this visit talking about smoking cessation strategies" and diabetes management. [Tr. 280]. Dr. Culbert further wrote that "[w]e have tried every sort of strategy that I am aware of to try and improve this value [glucose level] *but apparently the patient has a very erratic eating pattern*[.]" [Tr. 280] (emphasis added).

In March 2004, Dr. Culbert generated a "to whom it may concern" letter, opining that

5

> Ms. Davis is disabled with her diabetes. She is insulin requiring. Her blood sugars are virtually uncontrollable. We are trying to get this regulated, but without much success[.] Patient would be prone to hypoglycemic episodes and is probably unable to work at a regular job with sustained activity[.]

[Tr. 293]. In a May 2004 follow-up letter, Dr. Culbert wrote that "[h]er diet undoubtedly plays a significant part in control of her diabetes, as it does with all diabetics. Even with excellent dietary adherence she is still going to be insulin requiring." [Tr. 297].

Dr. Jeffrey Summers performed a consultative examination in July 2002. Plaintiff reported stiffness and pain in her lower back which is worsened by lifting greater than twenty pounds, bending, or stooping. [Tr. 183]. Plaintiff also stated that carpal tunnel syndrome causes weakness, numbness, and tingling in both hands. [Tr. 183]. Lastly, plaintiff complained that her uncontrolled diabetes limits her ability to perform strenuous activity. [Tr. 183].

In material part, Dr. Summers's examination revealed a mildly decreased range of motion at the lumbar spine. [Tr. 185]. Plaintiff exhibited full grip strength. Her fingering abilities and manual dexterity were intact. Tinel's and Phalen's signs were absent. [Tr. 185].[2]

---

[2]

Physicians can use specific tests to try to produce the symptoms of carpal tunnel syndrome. In the Tinel test, the doctor taps on or presses on the median nerve in the patient's wrist. The test is positive when tingling in the fingers or a resultant shock-like sensation occurs. The Phalen, or wrist-flexion, test involves having the patient hold his or her forearms upright by pointing the fingers down and pressing the backs of the hands together. The presence of carpal tunnel syndrome is suggested if one or more symptoms, such as tingling or increasing numbness, is felt in the fingers within 1 minute.

*See* http://www.ninds.nih.gov/disorders/carpal_tunnel/detail_carpal_tunnel.htm (last visited Jan. 24,
(continued...)

Dr. Summers found "no objective evidence to support impairment at this time due to [diabetes]." [Tr. 185]. Based on plaintiff's subjective complaints and her mildly reduced lumbar range of motion, Dr. Summers predicted that her abilities to bend, stoop, and lift more than twenty pounds would be "affected." [Tr. 185]. Regarding plaintiff's carpal tunnel complaints, "[b]ased on her history and exam, [Dr. Summers] recommend[ed] that she avoid repetitive motion activities involving grasping, fingering, and manipulating objects with her hands." [Tr. 186].

B. Mental

Plaintiff was briefly admitted to Ridgeview Psychiatric Hospital in June 2001 following two alleged suicide attempts. [Tr. 180]. According to earlier Ridgeview notes, at least one of plaintiff's purported suicide attempts was secondary to an argument with her boyfriend. [Tr. 225]. Psychiatrist Renu Bhateja noted that plaintiff "stabilized quickly . . . and felt ready to be discharged." [Tr. 181]. The administrative record documents sporadic continued counseling at Ridgeview, but Dr. Bhateja's handwritten notes are essentially illegible.

Alice Garland, M.S. performed a consultative examination in August 2002. Plaintiff's intelligence was estimated as "borderline." [Tr. 191]. Ms. Garland concluded that plaintiff would be

---

[2](...continued)
2007).

> limited in her ability to do complex and detailed work. Her ability to persist and concentrate was somewhat limited today. . . . Concentration was poor. . . . Ability to get along with people did not appear to be significantly limited but ability to work with the public may be limited at least on an intermittent basis by the claimant's level of emotional lability. Ability to adapt may be limited, at least intermittently, by the claimant's emotional lability and dependent traits[.]

[Tr. 192]. A state agency physician completed a Mental Residual Functional Capacity Assessment the following month, predicting a moderate-to-marked limitation in carrying out detailed instructions. [Tr. 193-94]. Deborah Abraham, Ph. D. completed the same form in November 2002, predicting marked limitations of understanding, remembering, and carrying out detailed instructions. [Tr. 253-54].

Pamela Branton, M.S. performed a consultative examination in February 2004. Consistent with her hearing testimony and the records of Dr. Culbert, plaintiff reported that she "eats no certain number of meals a day." [Tr. 287]. Prior to testing, plaintiff's intelligence was estimated as "borderline." [Tr. 286]. Word recognition and math calculation test scores "render[ed] her functionally illiterate." [Tr. 288]. Verbal scores fell in the mildly mentally retarded range. [Tr. 289]. However, because plaintiff's verbal results were consistently lower than her performance and perceptual results, Ms. Branton opined that "her true ability . . . likely falls in the borderline range." [Tr. 289]. Ms. Branton concluded that plaintiff would be moderately to markedly limited in understanding, remembering, and carrying out detailed instructions. [Tr. 291-92].

IV.

*Expert Testimony*

Vocational expert Joann Bullard ("VE") testified at plaintiff's administrative hearing. The ALJ presented a hypothetical claimant of plaintiff's age, work experience, and "marginal literacy." The hypothetical claimant would be capable of simple, repetitive jobs at the medium exertion level, but limited by degenerative disk disease of the low back, a hernia, bilateral carpal tunnel complaints, insulin-dependent diabetes, "urinary frequency" complaints, borderline intellectual functioning, poor concentration, emotional lability, and moderate impairments of: judgment; interaction with the public; interaction with supervisors and coworkers; and ability to handle pressure and changes in the work setting. [Tr. 68-69].

In response, the VE identified several jobs existing in the local and national economies that the hypothetical claimant would be capable of performing. [Tr. 69]. The VE further testified that jobs would also exist for the hypothetical claimant at the light level of exertion. [Tr. 70]. A marked inability to carry out and remember detailed instructions would not affect the number of listed jobs. [Tr. 70]. Marked emotional lability would preclude all employment. [Tr. 70-71]. Inability to reach frequently would eliminate 98 percent of the listed jobs. [Tr. 71]. All employment would be precluded by the need for excessive breaks resulting from frequent urination, or frequent absences caused by respiratory problems. [Tr. 71-73].

V.

*Applicable Legal Standards*

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's decision. 42 U.S.C. § 405(g)*; Richardson v. Sec'y of Health & Human Servs.*, 735 F.2d 962, 963 (6th Cir. 1984). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The "substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Beavers v. Sec'y of Health, Educ. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488 (1951)). In reviewing administrative decisions, the court must take care not to "abdicate [its] conventional judicial function," despite the narrow scope of review. *Universal Camera*, 340 U.S. at 490.

An individual is eligible for SSI benefits on the basis of financial need and either age, blindness, or disability. *See* 42 U.S.C. § 1382(a). "Disability" is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). Disability is evaluated pursuant to a five-step analysis summarized as follows:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.
>
> 4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) (citing 20 C.F.R. § 404.1520). Plaintiffs bear the burden of proof at the first four steps. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at step five. *Id*.

VI.

*Analysis*

On appeal, plaintiff levels a multitude of criticisms toward the ALJ's RFC findings, which were the foundation for the VE testimony upon which the ALJ's ultimate decision was based. To the extent that plaintiff's criticisms involve evidence that was before the ALJ, the court will address those issues in turn.

To the extent that plaintiff's criticisms rely on evidence first submitted to the Appeals Council, the court is not permitted to consider that evidence in determining whether to uphold, reverse, or modify the ALJ's decision. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996). Further, as made clear in footnote one of this opinion, plaintiff's additional evidence will not be considered by this court in the context of sentence six remand because plaintiff has waived that issue. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1233 (6th Cir. 1993) ("Plaintiff has not only failed to make a showing of good cause, but also has failed to even cite this relevant section or argue a remand is appropriate."); *see also McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (citation omitted).

A. <u>Noncompliance with Prescribed Diabetic Treatment</u>

The ALJ concluded that plaintiff could control her diabetes through proper diet and medication, and that she had not demonstrated good cause for her "fail[ure] to cooperate

in the treatment of her diabetes." [Tr. 23, 25-26]. "An impairment that can be remedied by treatment will not serve as a basis for a finding of disability." *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967). The treatment records of Dr. Culbert clearly indicate that insulin pump usage and adherence to proper diet are of critical importance in controlling plaintiff's purportedly disabling hypoglycemic episodes. Plaintiff has refused to follow either of these prescribed treatments.[3]

A claimant who does not follow "prescribed treatment without a good reason" is not disabled. *See* 20 C.F.R. § 416.930(b). The Commissioner's regulations offer examples of "good reason" for not following prescribed treatment:

> (1) The specific medical treatment is contrary to the established teaching and tenets of your religion.
>
> (2) The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment.
>
> (3) Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment.
>
> (4) The treatment because of its enormity (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or
>
> (5) The treatment involves amputation of an extremity, or a major part of an extremity.

---

[3] Although Dr. Culbert has stated that plaintiff would require insulin "[e]ven with excellent dietary adherence," plaintiff cites no authority for the proposition that the mere usage of insulin renders one disabled. The court also acknowledges treating physician Culbert's opinion that plaintiff is "disabled" because she is "prone to hypoglycemic episodes." However, the ultimate issue of disability is reserved to the Commissioner, not the treating physician. 20 C.F.R. § 416.927(e)(1).

13

20 C.F.R. § 416.930(c). In the present case, substantial evidence supports the conclusion that plaintiff has offered no good reason for her failure to follow prescribed treatment.

Through counsel, plaintiff argues that her administrative hearing testimony was at times so nonsensical [Tr. 55, 65-66] as to itself be evidence of disability. Specifically, counsel contends that plaintiff is "obviously mentally deficient and [thus] . . . unable to control her diet[.]" However, plaintiff is admittedly able to keep up with her medications and dosages. [Tr. 57-58, 173]. Her administrative hearing testimony illustrates that she understands *how* to monitor and control her diabetes, irrespective of whether or not she *chooses* to do so. [Tr. 50-52]. Dr. Bhateja has described plaintiff as "aware and knowledgeable regarding physical problems - insulin - diet - etc." [Tr. 275]. Examiners Garland and Branton deemed plaintiff capable of managing her own money. [Tr. 191, 288, 292]. If plaintiff is mentally capable of driving, comprehending her medication regime, and managing her own money, then substantial evidence supports the conclusion that she is also mentally capable of adhering to a prescribed diet.

In a similar vein, plaintiff argues that illiteracy excuses her dietary noncompliance. Plaintiff cites examiner Branton's assessment of "functional illiteracy" and her fourth grade word recognition level. As noted by the ALJ [Tr. 43], under the Commissioner's regulations a claimant may be either "illiterate" or "marginally educated." Those terms are defined as follows:

>   (1) *Illiteracy*.  Illiteracy means the <u>inability</u> to read or write.  We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name.  Generally, <u>an illiterate person has had little or no formal schooling</u>.
>
>   (2) *Marginal education*.  Marginal education means ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs.  <u>We generally consider that formal schooling at a 6th grade level or less is a marginal education</u>.

20 C.F.R. § 416.964(b) (emphasis added).  Plaintiff's tenth grade education and her fourth grade word recognition level provide substantial evidence for the ALJ's conclusion that she is "marginal" rather than "illiterate" under the above definitions.  Regardless, there is substantial evidence that plaintiff's limited education does not prevent her from managing her medication and her money.  Again, she should therefore also be able to adhere to a standard prescribed diet.

> In sum, plaintiff's difficulties are unquestionably compounded by her refusal to meaningfully participate in her own health care.  Whether she "likes" her prescribed diet [Tr. 55], or whether she "likes" her insulin pump [Tr. 232], should not be the Commissioner's concern.
>
>   The Social Security Act did not repeal the principle of individual responsibility. Each of us faces myriads of choices in life, and the choices we make, whether we like it or not, have consequences.  If the claimant in this case chooses to drive [her]self to an early grave, that is [her] privilege – but if [she] is not truly disabled, [she] has no right to require those who pay social security taxes to help underwrite the cost of [her] ride.

*Sias v. Sec'y of Health & Human Servs.*, 861 F.2d 475, 480 (6th Cir. 1988).

## B. Dr. Summers's Assessment

Consulting examiner Summers, citing plaintiff's subjective complaints and her mildly reduced lumbar range of motion, predicted that the abilities to bend, stoop, and lift more than twenty pounds would be "affected." Also, citing "her history and exam," Dr. Summers recommended that plaintiff "avoid repetitive motion activities involving grasping, fingering, and manipulating objects with her hands."

The ALJ did not expressly address Dr. Summers's evaluation in his decision, nor did he adopt the above-cited limitations in his RFC findings. Plaintiff contends that this is reversible error. Because the court finds - at a minimum - indirect support for the challenged rejection of Dr. Summers's opinions, any alleged error will be deemed harmless.

An administrative decision should generally not be reversed and remanded where doing so would be merely "an idle and useless formality." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) (citation omitted). At the same time, a reviewing court cannot find an error to be harmless solely because the claimant "appears to have had little chance of success on the merits anyway." *Id.* at 546 (citation omitted). Instead, the court must be able to discern at least *some* indirect support for the challenged rejection of a pertinent opinion, such as:

1. The medical opinion was so patently deficient that no reasonable fact-finder could have credited it;

2. The ALJ elsewhere adopted the opinion;

3. An earlier decision by the ALJ adequately addressed the issue; or

4. The ALJ's reasoning could be inferred from his overall discussion of the condition.

*Id.* at 547; *Hall v. Comm'r of Soc. Sec.*, No. 04-5572, 2005 WL 2139890, at *6-9 (6th Cir. Sept. 2, 2005).

Regarding Dr. Summers's equivocal opinion that plaintiff's lifting, bending, and stooping would be "affected," the court notes the ALJ's statement that "[t]here are no objective findings confirming *significant* degenerative disc disease or other impairments reasonably expected to cause back pain severe enough to preclude medium exertion[.]" [Tr. 23]. The ALJ's reasoning can therefore be inferred from his overall discussion of the condition, *see id.*, and is supported by substantial evidence.

Dr. Summers found no more than a "mild" reduction in range of motion of the lumbar spine. Complaints of back pain to the treating physician have been sporadic, with no objective findings in support, and treated only with "conservative measures" and minimal prescription medication. [Tr. 231, 294]. Plaintiff has elsewhere stated that she uses only baby aspirin [Tr. 104, 134], aspirin [Tr. 183], or no pain medication at all. [Tr. 125]. As stated by the ALJ, "[t]his minimal treatment itself lessens the credibility of the claimant's complaints." [Tr. 23].

Substantial evidence can therefore be found to support the rejection of Dr. Summers's equivocal "affected" statement. Plaintiff simply has not produced sufficient objective evidence to support to severity of her alleged back limitations. *See Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847 (6th Cir. 1986). In the alternative, the court notes that the ALJ received VE testimony that jobs would exist for the hypothetical claimant if the exertion level were reduced from medium to light, as desired by plaintiff. [Tr. 70].

As for Dr. Summers's prediction that plaintiff is incapable of repetitive grasping, fingering, and manipulating due to carpal tunnel syndrome, that opinion "is so patently deficient that the Commissioner could not possibly credit it[.]" *Wilson*, 378 F.3d at 547. Although Dr. Summers based his opinion on "her history and exam," his examination in fact revealed full grip strength, intact fingering abilities, intact manual dexterity, and negative Tinel's and Phalen's testing. Further, the records of Dr. Culbert show no treatment for, or complaints of, carpal tunnel syndrome. The ALJ correctly, albeit indirectly, explained his rejection of Dr. Summers's opinion by pointing out that there is no objective evidence of carpal tunnel syndrome in the present record. [Tr. 23].

## C. Additional Issues

The VE testified that the need for excessive breaks resulting from frequent urination would preclude all employment. [Tr. 73]. However, the administrative record contains no objective evidence that plaintiff suffers from such a condition. Further, she admittedly takes no medication to control urinary frequency, nor does she wear protective

pads. [Tr. 73]. Plaintiff's mere allegation that she had to leave her administrative hearing to use the restroom [doc. 63] is not sufficient proof of disability.

Next, in response to a line of questioning (with which the ALJ was "not . . . overly impressed") by plaintiff's counsel, the VE testified that frequent absences due to respiratory problems would preclude all employment. [Tr. 71-72]. The court notes, however, that plaintiff denied any respiratory complaints to Dr. Summers. [Tr. 184]. Further, plaintiff's one or more pack per day, twenty-eight year, smoking habit decimates counsel's argument. [Tr. 72, 184, 190, 223].

## D. Conclusion

In sum, the court finds substantial evidence to support both the ALJ's RFC findings and his ultimate conclusion. The substantial evidence standard of review grants ALJs "a zone of choice" within which they can weigh conflicting evidence. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986). Perhaps a different factfinder could have reached a different conclusion in this case, but that is not the standard of review binding this court. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir.1993). The final decision of the Commissioner will be affirmed, and an order consistent with this opinion will be entered.

ENTER:

        s/ Leon Jordan
    United States District Judge